UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
MICHELE BONNI MICHELSON,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     15-CV-0650 (JS)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                    Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:      Sharmine Persaud, Esq.
                    Law Office of Sharmine Persaud
                    1105 Route 100
                    Farmingdale, NY 11735

For Defendant:      Matthew Silverman, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East, 7th Floor
                    Brooklyn, NY 11201

SEYBERT, District Judge:

          Plaintiff Michele Bonni Michelson ("Plaintiff") brings

this action pursuant to Section 405(g) of the Social Security Act,

42 U.S.C. § 405(g), challenging the Commissioner of Social

Security's (the "Commissioner") denial of her application for

disability insurance benefits.  Presently pending before the Court

are the Commissioner's motion for judgment on the pleadings,

(Docket Entry 26), and Plaintiff's cross motion for judgment on

the pleadings, (Docket Entry 29).  For the following reasons, the

Commissioner's motion is GRANTED, and Plaintiff's motion is

DENIED.

<u>BACKGROUND</u>[1]

I.  <u>Procedural Background</u>

On March 21, 2012, Plaintiff filed for social security disability benefits, claiming a disability since July 27, 2010. (R. 83, 155.)  Plaintiff subsequently amended her disability onset date to July 22, 2010.  (R. 228.)  Plaintiff alleges that she is disabled based on degenerative disc disease of the lumbar spine and lymphedema of the left upper extremity.  (R. 22.)  On October 16, 2012, Plaintiff's application was denied.  (R. 87.) On August 20, 2013, a hearing took place before Administrative Law Judge Brian J. Crawley (the "ALJ").  (R. 37-82.)  Plaintiff was represented by counsel at the hearing, and the ALJ heard testimony from Plaintiff and Dr. Taitz, a vocational expert.  (R. 20.)

On September 19, 2013, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 20-31.)  On October 17, 2013, Plaintiff sought review of the ALJ's decision by the Appeals Council.  (R. 14.)  On December 24, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5.)

---

[1] The background is derived from the administrative record filed by the Commissioner on May 11, 2015, (Docket Entry 9), and the supplemental administrative record filed by the Commissioner on September 9, 2015, (Docket Entry 14).  "R." denotes the administrative record.

Plaintiff then commenced this action on February 9, 2015. On September 9, 2015, the Commissioner filed her first motion for judgment on the pleadings. (Docket Entry 15.) On October 14, 2015, Plaintiff filed a motion to strike the supplemental administrative transcript (the "Motion to Strike"). (Docket Entry 18.) On August 10, 2016, the Court denied Plaintiff's Motion to Strike, and denied the Commissioner's first motion for judgment on the pleadings without prejudice and with leave to refile after the approval of a briefing schedule. (Order, Docket Entry 24, at 10-11.) The Commissioner filed her second motion for judgment on the pleadings on August 26, 2016, (Comm'r Mot., Docket Entry 26), and Plaintiff cross-moved for judgment on the pleadings on October 27, 2016, (Pl.'s Mot., Docket Entry 29).

## II. Evidence Presented to the ALJ

### A. Testimonial Evidence

At the time of the administrative hearing, Plaintiff was forty-nine years old with a high school education. (R. 23.) She lives alone and cares for her cat. (R. 41.) Plaintiff suffers from back pain, particularly "stiffness and an inability to stand for long periods of time, sit for long periods of time, carry, [or] lift." (R. 46.) Plaintiff had back surgery "a while back." (R. 49.) Plaintiff had breast cancer and suffers lymph node issues with respect to swelling in her left arm. (R. 46.) She is advised not to carry her pocketbook with her left arm or carry more than

one or two pounds. (R. 46.) Plaintiff can use her left arm for daily living activities, such as eating and buttoning or zippering clothing, but she has no feeling in her arm. (R. 47.) However, she has feeling in her left hand. (R. 47.) If Plaintiff carried a gallon of milk, her arm could swell, and if the fluid remained in her arm it would become hard and her arm would be difficult to move. (R. 48-49.)

When asked about her daily activities, Plaintiff testified: "I care for myself. I don't have any restrictions. I can clothe myself, bathe myself, [and] feed myself." (R. 53.) Plaintiff does not need help getting dressed or getting in the bath or shower. (R. 60.) She cooks, vacuums at limited intervals, does laundry, and goes food shopping. (R. 54.) Plaintiff does not need assistance with these tasks because she performs them in "small quantities, multiple times." (R. 54.) Plaintiff also drives. (R. 55.) Plaintiff performs back strengthening home exercises and walks an average of an eighth of a mile to a quarter of a mile. (R. 53.) She suffers from back spasms and can no longer walk two to four miles. (R. 53.)

Plaintiff is able to sit for a half hour. Her ability to stand depends on the day, as some days she is uncomfortable and spends more time lying down. (R. 56.) Plaintiff has two to three bad days per week where her back pain is a six to seven out of ten; on good days, Plaintiff's pain is a four to five out of ten.

(R. 57.) At the time of the hearing, Plaintiff was prescribed Flexeril, Tamoxifen, Ambien, and took large amounts of Motrin. (R. 57-59.) Plaintiff suffers side effects from Tamoxifen that include weight gain, insomnia, hot flashes, and skin irritation. (R. 58.) Plaintiff does not use a cane or wear any braces. (R. 59-60.)

After Plaintiff's alleged disability onset date of July 22, 2010, she worked as a receptionist at Curves for three hours, two or three days per week. (R. 41-42.) She stopped working at Curves in April 2011 and resumed work in October 2011. She was subsequently laid off in June 2012. (R. 45.)

Previously, Plaintiff had worked for Nassau County as a paramedic until she was placed on light duty and performed paperwork and phone work in connection with 911 calls. (R. 49.) Plaintiff was required to sit for twelve-hour periods. She could do certain tasks standing up, but her writing was easier to do while sitting down. (R. 52.) Plaintiff had difficulty with the sitting part of the job, but she was given accommodations. (R. 51.) Plaintiff left her job when she accepted a retirement incentive, but at the time of the hearing, she physically could return to her job. (R. 52.)

Dr. Yaakov Taitz ("Taitz"),[2] an impartial vocational expert, appeared and testified at the administrative hearing. (R. 61.) The ALJ presented Taitz with a hypothetical individual who had the same age, education level, and work experience as Plaintiff and could sit for less than two hours, and walk or stand for less than two hours during an eight hour work day. (R. 61.) Taitz testified that such an individual could not perform Plaintiff's past work or any alternative work. (R. 61.) The ALJ presented a second hypothetical individual with the same age, education, and past work experience as Plaintiff who could perform sedentary work with the limitation of only using the left upper extremity for occasional lifting. (R. 62.) Taitz testified that this hypothetical individual could not perform Plaintiff's past work but could hold the positions of charge account clerk,[3] telephone quotation clerk, or telephone solicitor. (R. 62-63.) All of these jobs could be performed with one arm and occasional reaching and handling. (R. 64.)

---

[2] While the transcript of the hearing includes a phonetic spelling of the vocational expert's name as "Tates," (R. 61), the ALJ's decision notes that the vocational expert is named Yaakov Taitz, (R. 20).

[3] Charge account clerks work in the credit card or banking card industry and assist customers with charges and plans, filling applications, and making sure their credit information is current. (R. 68.)

Plaintiff's counsel presented Taitz with a hypothetical individual who must take a break for at least five minutes every hour to relieve discomfort. (R. 65.) Taitz testified that such a worker would be able to perform any of the three jobs he previously mentioned and noted that no stooping is required for these jobs. (R. 66, 74-75.) However, if the hypothetical worker was off task thirty percent of the time or absent from work three to four times per month, they would not be able to perform these jobs. (R. 75-76.) The acceptable amount of absenteeism for these jobs is one day per month, and the acceptable amount of time off task is ten percent per day. (R. 76.)

B.    Medical Evidence

1.    Evidence Prior to Disability Onset Date

Plaintiff reported that she suffered from lower back pain in 1991 when she twisted her back at work. (R. 380.) An MRI revealed a herniated disc between L5-S1, and that same year, Plaintiff had a laminectomy of the lumbar spine. (R. 380.) Plaintiff reported that she received three epidural blocks that slightly helped. (R. 380.) In 2001, Plaintiff's MRI of the lumbar spine revealed degenerative disc disease at L4-5 and L5-S1 with a broad bulge and posterior ridging and disc bulge at those levels. (R. 428-29.)

In 2002, Plaintiff began treating with Dr. Peter Ajemian regarding her back pain and discomfort in the left lower extremity.

(R. 436.) In 2003, a lumbar myelogram and post myelogram CT revealed a small/moderate circumferential bulge at L4-L5. (R. 430.) In 2009, an MRI was negative for herniated discs or stenosis, but revealed a mild bulging disc at L4-L5 with lateral extensions and compromise of the neuroforamina mildly bilaterally. (R. 435.) On August 26, 2009, Dr. Ajemian saw Plaintiff and assessed her as suffering from mild degenerative disc disease and bulging disc at L4-5 without a herniated disc. (R. 437.) Dr. Ajemian recommended home exercise and stretching. (R. 437.)

On April 20, 2010, Plaintiff saw Dr. Ajemian and continued to display restrictions in spine extension, flexion, left and right rotation, and tilting. (R. 439.) Dr. Ajemian's impression was lumbar spine herniated disc at L4-5 and left more than right lumbar radiculopathy. (R. 439.) Plaintiff was pursuing physical therapy, and was prescribed Vicodin. (R. 439-40.)

### 2. Breast Cancer and Lymphedema

In 2011, Plaintiff underwent treatment for breast cancer. (R. 288.) In May 2011, Plaintiff underwent a left-sided lumpectomy and left partial mastectomy. (R. 288.) In June 2011, Plaintiff's residual calcifications appeared to be benign. (R. 279.) Thereafter, Plaintiff proceeded with radiation therapy and began taking Tamoxifen. (R. 340-41, 371.) In November 2011, Plaintiff's testing and evaluations did not reveal any suspicious masses. (R. 340-41, 371-72.)

In an undated letter, Donna Hannah, an occupational therapist, indicated that she was treating Plaintiff for lymphedema. (R. 385.) Ms. Hannah used kinesiotape to help remove swelling from Plaintiff's hand and digits as well as a light massage treatment. (R. 385.) Ms. Hannah opined that Plaintiff's lymphedema may have been triggered by overuse from exercise. (R. 385.) Ms. Hannah indicated that Plaintiff improved after she stopped exercising with her left arm. (R. 385.) Ms. Hannah intended to have Plaintiff "gradually progress an exercise program to determine what her system will handle as exercise is very important to her." (R. 385.)

### 3. Back Pain

On August 5, 2010, Dr. Ajemian wrote a letter stating that Plaintiff suffered from a bulging disc at L4-5 and persistent lumbar radiculopathy to the lower left extremity. (R. 441.) Dr. Ajemian opined that he did not expect Plaintiff to "improv[e] beyond her current status, as her condition interferes with her performing her job in a pain free manner." (R. 441.)

### a. Dr. Shapiro

On April 16, 2012, Plaintiff began seeing Dr. Michael Shapiro of Orlin & Cohen Orthopedic Associates LLP for her back pain. (R. 398.) Dr. Shapiro noted that Plaintiff's back pain started in 1991, and she reported dull/aching and tight pain that was four out of ten when active and two out of ten at rest.

(R. 398.)    Dr.  Shapiro  noted  diminished  range  of  motion  in Plaintiff's back.  (R. 398.)  An MRI of the lumbar spine revealed "straightening consistent with spasm, facet arthropathy and disc space narrowing."  (R. 399, 400.)  The radiologist's impression was "[e]xaggerated lumbar lordosis with a transitional appearance of the L5-S1 disc segment with asymmetric disc bulging towards the left L4-L5."  (R. 400.)  However, the radiologist noted that there was  no  central  stenosis  or  exiting  nerve  root  impingement,  no postoperative fluid collections or discitis, and no acute osseous injury.  (R. 400.)  An x-ray of the pelvis revealed no fractures, subluxations,  dislocations,  or  significant  abnormalities.   (R. 399.)   Dr.  Shapiro's  assessment  was  lumbago,  degenerative  disc disease, and lumbar.  (R. 399.)

On April 23, 2012, Dr. Shapiro completed a Medical Source Statement (the "Medical Source Statement").[4]  (R. 239-41.)  Dr. Shapiro found that Plaintiff could frequently or occasionally lift and carry less than ten pounds per day; stand, walk, and sit less than two hours during an eight hour day; and sit or stand before changing positions for forty-five to sixty minutes.  (R. 239-40.) Dr.  Shapiro  found  that  Plaintiff  must  walk  around  for  ten  to fifteen  minutes  every  forty-five  to  sixty  minutes;  needs  the

_____

[4] While the signature on this document is illegible, Plaintiff's counsel clarified at the hearing that this Medical Source Statement was completed by Dr. Shapiro.  (R. 44.)

ability to shift at will from sitting or standing/walking; and will need to lie down at unpredictable intervals during a work shift. (R. 240.) Dr. Shapiro concluded that Plaintiff could occasionally twist, stoop, crouch, climb stairs, and climb ladders, and that Plaintiff's impairment affected her reaching, handling, and pushing/pulling. (R. 240-241.) Dr. Shapiro anticipated that Plaintiff would be absent from work more than three times per month. (R. 241.)

On June 11, 2012, Plaintiff saw Dr. Shapiro and reported pain that was five or six out of ten when active and three or four out of ten when resting. (R. 396.) Dr. Shapiro's physical examination revealed a diminished range of motion in Plaintiff's back. (R. 396.) On September 10, 2012, Plaintiff saw Dr. Shapiro and rated her pain as four out of ten when active and four out of ten at rest. (R. 442.) Plaintiff was attending physical therapy, and Dr. Shapiro noted a diminished range of motion in Plaintiff's back and opined that she would be a candidate for 2 level anterior lumbar fusion. (R. 442-43.) On December 6, 2012, Plaintiff saw Dr. Shapiro and complained of dull/aching and tight back pain that was a three out of ten when active and a two out of ten at rest. (R. 394.) Dr. Shapiro noted a diminished range of motion in Plaintiff's back. (R. 394.)

On June 6, 2013, Plaintiff saw Dr. Shapiro and rated her pain as nine out of ten when active and four out of ten at rest.

(R. 444.) Dr. Shapiro noted neurological weakness and diminished range of motion in Plaintiff's back. (R. 445.) Dr. Shapiro formally requested authorization for spine physical therapy and massage therapy. (R. 445.) A letter from Dr. Shapiro also dated June 6, 2013, stated that his opinion regarding Plaintiff's ability to engage in work-related activities as expressed in his Medical Source Statement remained unchanged. (R. 418.) Dr. Shapiro concluded that as a result of her impairments, Plaintiff was "unable to sustain full-time employment on a regular, consistent basis, even of a sedentary nature." (R. 418.)

> b. <u>Dr. Skeene</u>

On September 26, 2012, Plaintiff was examined by Dr. Skeene in connection with a referral from the Division of Disability Determination. (R. 380.) Plaintiff's chief complaint was lower back pain, and she reported that she had done physical therapy on and off for the past ten years, which slightly helped, but the pain persisted. (R. 380.) Plaintiff reported sharp, constant pain with a four out of ten intensity that radiates to the left leg. (R. 380.) Plaintiff also reported that her lower back pain is aggravated by sitting or standing longer than ten minutes, walking more than five blocks, climbing more than one flight of steps, and lifting more than five pounds. (R. 380.) Motrin 200 mg once daily provided Plaintiff with some pain relief.

(R. 380.)    In addition to Motrin, Plaintiff was also taking Flexeril and Tamoxifen.  (R. 380.)

Dr. Skeene observed that Plaintiff did not appear to be in acute distress, walked with a normal gait, was able to walk on heels and toes without difficulty, and was able to fully squat and employ a normal stance.    (R. 381.)    Plaintiff did not need assistance changing for the exam or getting on or off the exam table, and was able to get up from her chair without difficulty. (R. 381.)  However, Dr. Skeene observed that Plaintiff had limited range of motion of the lumbar spine, and was only able to flex and extend the lumbar spine to forty-five degrees, her lateral flexion bilaterally was at ten degrees, and her lateral rotation bilaterally was at twenty degrees.  (R. 382.)  Dr. Skeene indicated that Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally, and full range of motion of her hips, knees, and ankles bilaterally.  (R. 382.)  Dr. Skeene also did not observe any redness, heat, swelling, or effusion.  (R. 382.)  Dr. Skeene concluded that Plaintiff had "moderate limitation for prolonged standing, walking, and heavy lifting due to limited [range of motion] of the lumbar spine."  (R. 383.)  Dr. Skeene also noted that Plaintiff suffered from lymphedema of the left arm.  (R. 383.)

### c.  G. Acosta

On October 5, 2012, G. Acosta, a medical consultant, completed a physical residual functional capacity assessment.  (R. 388-93.)  Acosta concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday.  (R. 389.)  Acosta also concluded that Plaintiff was able to frequently balance, stoop, kneel, crouch, and crawl, but never climb or balance on ramp, stairs, ladder, rope, or scaffolds due to back pain and limited range of motion of the lower spine.  (R. 390.)  Acosta further concluded that Plaintiff's allegations of pain and her ability to lift only five pounds and stand less than fifteen minutes were "partially credible."  (R. 391.)

### d.  Dr. Fulco

On May 6, 2013, Dr. Osvaldo Fulco completed a Medical Interrogatory as an impartial medical expert.  (R. 404-14.)  Dr. Fulco did not personally examine Plaintiff.  (R. 404.)  Dr. Fulco concluded that Plaintiff did not meet the Listing of Impairment for low back pain in the absence of any motor or sensory deficits. (R. 407.)  Dr. Fulco indicated that Plaintiff's functional limitations are: lift/carry twenty pounds occasionally, ten pounds frequently; stand/walk for two hours in an eight-hour period; sit for a total of six hours in an eight-hour period with a five minute

14

interruption every hour to relieve discomfort; and no bending, stooping, or crouching. (R. 408.) Dr. Fulco concluded that Plaintiff can also occasionally reach overhead and push/pull; frequently perform all other reaching; continuously engage in handling, fingering, and feeling; and occasionally operate foot controls. (R. 411.) Dr. Fulco further indicated that Plaintiff's limitations have been present since October 16, 2011. (R. 408.)

e. <u>Case Analysis</u>

On December 27, 2012, Dr. James Quinlan performed a Case Analysis. (R. 401-402.) Dr. Quinlan noted that Plaintiff attends exercise classes three to five times per week, cannot stand for long periods of time, can lift a maximum of ten pounds, and can walk two to four miles. (R. 401.) Dr. Quinlan concluded that Plaintiff's back pain is a severe impairment, but "there is a disconnect between what she alleges she can do in application and what she reports to [Dr. Skeene]." (R. 402.) Dr. Quinlan also noted that the only objective findings are a limited lumbar range of motion and an MRI indicating lumbar arthrosis, and there is no evidence of radiculopathy or weakness. (R. 402.) Dr. Quinlan concluded that the orthopedist's opinion exceeded objective findings. (R. 402.)

4. <u>Non-Medical Evidence</u>

On August 28, 2012, Plaintiff completed a Function Report. (R. 457-67.) Plaintiff indicated her daily activities

included brushing her teeth, stretching exercises, meals, exercise classes, and light housework. (R. 458.) Plaintiff stated that she could not lift more than ten pounds, sleep comfortably without pain medication, or sit or stand for long periods of time. (R. 458.) Plaintiff also indicated that she walks a few times per week and participates in Zumba classes that are "modified to what [she] can do" three to four times per week. (R. 461.) Plaintiff reported that she could lift less than ten pounds, stand for up to approximately fifteen minutes, and walk two to four miles with a stop to rest after approximately two miles. (R. 462-64.) Plaintiff further stated that she requires a "lumbar supportive chair" when sitting for extended periods of time. (R. 467.)

III. Evidence Presented to the Appeals Council

Plaintiff alleges that she submitted additional evidence to the Appeals Council that included Ms. Hannah's occupational therapy records and treatment notes from Dr. Shapiro dated August 19, 2013. (Pl.'s Br., Docket Entry 29-1, at 8-9.) The additional occupational therapy records, (R. 447-51) indicate that Plaintiff began treating with Ms. Hannah on May 15, 2012 for lymphedema in her left upper extremity and she reported having no pain with lymphedema, but suffering from numbness in the left axilla at a level of seven out of ten. (R. 447-48.) Plaintiff reported that her lymphedema began to occur within the last three weeks of her appointment, and the swelling in her arm used to

reduce at night, but it did not reduce any longer.  (R. 448.)
Plaintiff saw Ms. Hannah on nine occasions between May 15, 2012,
and her discharge on June 27, 2017.  (R. 450.)  Ms. Hannah utilized
therapy that included manual lymphatic drainage and attempted to
apply compression to the left upper extremity; however, "[a]ll
resulted in increased hand and digit edema, despite the fact that
a compression glove was attempted as well."  (R. 450.)  Ms. Hannah
further indicated that Plaintiff met her goals and was
knowledgeable about home maintenance techniques.  (R. 450.)

Dr. Shapiro's additional treatment notes indicate that
he saw Plaintiff on August 19, 2013, and she complained of
occasional spasms.  (R. 452-54.)  Plaintiff rated her pain as six
and eight out of ten when active and five out of ten at rest.
(R. 452.)  Dr. Shapiro noted diminished range of motion in
Plaintiff's back.  (R. 453.)  Dr. Shapiro formally requested
authorization for physical therapy.  (R. 454.)

DISCUSSION

I.  Standard of Review

In reviewing the ruling of an ALJ, the Court does not
determine de novo whether the plaintiff is entitled to disability
benefits.  Thus, even if the Court may have reached a different
decision, it must not substitute its own judgment for that of the
ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).
Instead, this Court must determine whether the ALJ's findings are

supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Persico v. Barnhart, 420 F. Supp. 2d 62, 70 (E.D.N.Y. 2006) (internal quotations marks and citation omitted). If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id. To determine if substantial evidence exists to support the ALJ's findings, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted).

II. Determination of Disability

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See Boryk ex. rel Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *7 (E.D.N.Y. Sept. 17, 2003). A claimant is disabled under the Act when she can show an inability "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, the Commissioner considers whether the claimant suffers from a "severe medically determinable physical or mental impairment" or a severe combination of impairments that satisfy the duration requirement set forth at 20 C.F.R. § 404.1509. Third, if the impairment is "severe," the Commissioner must consider whether the impairment meets or equals any of the impairments listed in Appendix 1 of the Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(iii). "These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the listed impairments, he or she is conclusively presumed to be disabled and entitled to

benefits." <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995) (internal quotation marks and citations omitted). <u>Fourth</u>, if the impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity ("RFC") to perform tasks required in his previous employment. 20 C.F.R. § 404.1520(a) (4)(iv). <u>Fifth</u>, if the claimant does not have the RFC to perform tasks in his or her previous employment, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. 20 C.F.R. § 404.1520(a) (4)(v). If not, the claimant is disabled and entitled to benefits.

The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. <u>Selian v. Astrue</u>, 708 F.3d 409, 418 (2d Cir. 2013). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." <u>Boryk</u>, 2003 WL 22170596, at *8.

## III.  The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that Plaintiff is not disabled. (R. 20-31.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 22, 2010. (R. 22.)

At step two, the ALJ found that Plaintiff suffered from degenerative disc disease of the lumbar spine and lymphedema of the left upper extremity, severe impairments. (R. 22.)

At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal the severity of one of the impairments listed in Appendix 1 of the Social Security regulation. (R. 23.) The ALJ found that Plaintiff has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (R. 23-29.) The ALJ further concluded that Plaintiff is able to engage in:

> [P]ushing, pulling, lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; sitting six hours out of an eight-hour day, with accommodation to get up and stretch for five minutes once an hour; standing and walking two hours out of an eight-hour day; with occasional use--meaning up to about one-third of an eight-hour day-- of the left upper extremity for handling and fingering; and preclusion from stooping.

(R. 23.)

At step four, the ALJ concluded that Plaintiff could not perform her past relevant work. (R. 29.)

Finally, at step five, the ALJ concluded that Plaintiff could perform other work existing in the national economy based on her age, education, work experience, and residual functional

capacity. (R. 30-31.)  Thus, the ALJ determined that Plaintiff was not disabled. (R. 31.)

In reaching his decision, the ALJ gave little weight to Dr. Shapiro's opinion, concluding that Dr. Shapiro's stated limitations "exceed the objective findings demonstrable in the rest of the record and the claimant testified to greater capabilities during the instant hearing in this matter than those assessed [by Dr. Shapiro]."  (R. 27.)  The ALJ accorded "greater weight" to Dr. Fulco's interrogatory responses, concluding that they were "more consistent with the clinical diagnostic testing in the record."  (R. 27.)  The ALJ also accorded "some weight" to Dr. Quinlan's opinion as a non-examining source, and "great weight" to Dr. Skeene's opinion, which was prepared after he examined Plaintiff.  (R. 27-28.)  Finally, while the ALJ accorded Ms. Hannah's opinion the deference for "other sources," he noted that it could not be dispositive with respect to the issues before him. (R. 28.)

## IV.  Analysis of the ALJ's Decision

The Commissioner filed her motion first and argues that the ALJ's decision is supported by substantial evidence and he applied the correct legal standard.  (See generally Def.'s Br., Docket Entry 27.)  Plaintiff counters that the ALJ's decision should be reversed and remanded on the following grounds: (1) the ALJ misapplied the treating physician's rule; (2) the ALJ's

credibility determination is not supported by substantial evidence; and (3) the ALJ erred in finding that there is work in the national economy that Plaintiff could perform. (Pl.'s Br. at 11-24.) The Court addresses each argument below.

A.  Treating Physician's Rule

The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[5]  Nevertheless, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted).

---

[5] "While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect." Williams v. Colvin, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017).

When an ALJ does not afford controlling weight to the
opinion of a treating physician, she must consider factors that
include: "(1) the length of the treatment relationship and
frequency of the examination; (2) the nature and extent of the
treatment relationship; (3) the extent to which the opinion is
supported by medical and laboratory findings; (4) the physician's
consistency with the record as a whole; and (5) whether the
physician is a specialist." Schnetzler v. Astrue, 533 F. Supp. 2d
272, 286 (E.D.N.Y. 2008). The ALJ must also set forth "'good
reasons' for not crediting the opinion of a plaintiff's treating
physician." Id. Nevertheless, the ALJ is not required to engage
in a "slavish recitation of each and every factor where [his]
reasoning and adherence to the regulation are clear." Atwater v.
Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).

    1. Dr. Shapiro

    As set forth above, in according Dr. Shapiro's opinion
"little weight," the ALJ concluded that "the limitations espoused
in the opinion exceed the objective findings demonstrable in the
rest of the record," and "the claimant testified to greater
capabilities during the [ ] hearing in this matter than those
assessed [by Dr. Shapiro]." (R. 27.) Plaintiff argues that the
ALJ erred in reaching these conclusions, and that the ALJ failed
to discuss the relevant factors in declining to accord controlling

weight to Dr. Shapiro's opinion as a treating physician.[6]  (See generally Pl.'s Br. at 16-20.)  The Court disagrees.

First, the Court finds that the ALJ addressed the five factors to be considered in declining to accord a treating physician's opinion controlling weight.  As to the first two factors--the length of the treatment relationship and frequency of examination, and the nature and extent of the treatment relationship--the ALJ noted that Dr. Shapiro's treatment notes span from April 16, 2012 through June 6, 2013[7] and detail pain that has persisted for years and ranged from between three to nine out of ten.  (R. 24.)  As to the third factor--the extent to which the opinion is supported by medical and laboratory findings--the ALJ noted that Dr. Shapiro's Medical Source Statement was supported by his treatment notes and reports, and also referenced an MRI performed on April 16, 2012.  (R. 24, 26.)  Finally, as to the Fourth and Fifth Factors--consistency and status as a specialist--the ALJ expressly addressed consistency in concluding that Dr. Shapiro's limitations exceed both the objective findings in the

---

[6] Plaintiff also argues that the ALJ erred in failing to accord Dr. Shapiro's controlling weight based on his illegible handwriting.  (Pl.'s Br. at 13-14.)  While the ALJ did note that Dr. Shapiro's signature was illegible, (R. 27), the Court finds that this statement was a parenthetical comment, not a basis for the ALJ's accordance of little weight to Dr. Shapiro's opinion.

[7] As previously noted, Dr. Shapiro's treatment notes for August 19, 2013, were submitted to the Appeals Council and were not before the ALJ.  (Pl.'s Br. at 8-9.)

record and Plaintiff's testimony, and the ALJ noted that Dr. Shapiro is an orthopedist and, thus, a specialist. (R. 24, 27.)

Second, the ALJ's conclusion that the limitations set forth in Dr. Shapiro's opinions exceed the objective findings in the record and Plaintiff's testimony is supported by substantial evidence. As set forth above, in his Medical Source Statement dated April 23, 2012, Dr. Shapiro opined that Plaintiff was limited insofar as she could only, inter alia, stand and walk for less than two hours in an eight hour day, sit less than two hours during an eight hour day, and could only sit for forty five to sixty minutes before changing positions. (R. 239.) However, Dr. Shapiro's notes reflect that with the exception of one occasion when she reported nine out of ten pain when active, Plaintiff's active pain ranged from three to six out of ten[8] and her resting pain ranged from two to five out of ten. (R. 394, 396, 398, 442, 444-45, 452.) Additionally, while Dr. Shapiro noted a diminished range of motion in Plaintiff's back and assessed her as having lumbago and lumbar degenerative disc disease, he discussed conservative care options and injection therapy or surgery if conservative care failed. (R. 399.) Dr. Shapiro also noted that

---

[8] Dr. Shapiro's August 19, 2013, treatment notes which, again, were not before the ALJ, state that Plaintiff's active pain was six and eight out of ten and her resting pain was five out of ten. (R. 452.)

Plaintiff's sensation and pulses were intact in the bilateral lower extremities. (R. 398.)

Further, while the radiologist's impression of the April 16, 2012, MRI of Plaintiff's lumbar spine was "exaggerated lumbar lordosis with a transitional appearance of the L5-S1 disc segment with asymmetric disc bulging towards the left at L4-L5," (R. 400), there was no central stenosis or exiting nerve root impingement, no central stenosis or nerve root impingement with respect to the asymmetric disc bulging and bony ridging toward the left at L5-S1, no postoperative fluid collections or discitis, and no acute osseous injury. (R. 400.) The radiologist also found that there was no posterior disc herniation. (R. 400.)

The Court is also unpersuaded by Plaintiff's argument that Dr. Shapiro's opinion is not inconsistent with the opinion of Dr. Skeene with respect to Plaintiff's sitting and standing limitations. (Pl.'s Br. at 18-19.) As noted, Dr. Shapiro opined that Plaintiff could stand and walk for less than two hours in an eight hour day, sit less than two hours during an eight hour day, and could only sit for forty-five to sixty minutes before changing positions. (R. 239.) While Dr. Skeene did not opine as to Plaintiff's specific limitations regarding standing or sitting, his conclusion that Plaintiff has "moderate limitation for prolonged standing [and] walking" does not necessarily equate to Plaintiff only being able to sit or stand for less than two hours

in an eight-hour day. (R. 383.) The Court further disagrees with Plaintiff that the ALJ "presumed" Dr. Skeene's failure to opine on her sitting abilities indicated that Plaintiff did not have any sitting limitations. (Pl.'s Br. at 18-19.) As noted, the ALJ concluded that Plaintiff did, in fact, have sitting limitations insofar as she could only sit for six hours in an eight hour day with a five minute break to get up and stretch once every hour. (R. 23.)

Plaintiff also argues that Dr. Shapiro's opinion is supported by the opinion and notes of Dr. Ajemian, who treated Plaintiff from at least 2002[9] through August 5, 2010. (Pl.'s Br. at 19.) While Dr. Ajemian's notes detail Plaintiff's degenerative disc disease, bulging disc, and restrictions in spinal extension and rotation, (see generally R. 436-40), his sole opinion consists of his brief letter indicating that he did not expect Plaintiff to "improve[e] beyond her current status, as her condition interferes with her performing her job in a pain free manner," (R. 441.) Dr. Ajemian did not opine on whether Plaintiff was limited in her ability to sit or stand for extended periods of time. Moreover, it is not lost on the Court that Plaintiff did not retire from her job with Nassau County until July 2010, (R. 468); thus, with the

_____

[9] While Plaintiff alleges that Dr. Ajemian was her treating orthopedist since 1996, (Pl.'s Br. at 19), the record reflects that Plaintiff began treating with Dr. Ajemian in 2002, (R. 436.)

exception of his August 5, 2010 letter, the entirety of Dr. Ajemian's treatment took place during a time when Plaintiff was gainfully employed full-time.

Third, the ALJ's conclusion that Plaintiff testified to greater capabilities at the hearing than those assessed by Dr. Shapiro, (R. 27), is supported by substantial evidence. As set forth above, Plaintiff testified that she is able to clothe, bathe, and feed herself and she does not need assistance getting dressed. (R. 53-54, 60.) Plaintiff also testified that she cooks, vacuums at limited intervals, does laundry, and goes food shopping--albeit with the caveat that she perform these tasks in "small quantities, multiple times"--and testified that she told her orthopedist the day prior to the hearing that she could not walk down the grocery store aisle due to back spasms. (R. 52-55.) While Plaintiff testified that she can no longer walk two to four miles, she performs back strengthening exercises and walks an average of an eighth of a mile to a quarter of a mile. (R. 53.) Plaintiff also drives herself--although she obtains rides from others when available--and takes the bus or train if necessary. (R. 55.)

The Court acknowledges that Plaintiff testified she has about two to three "bad days" each week where her back pain is a six to seven out of ten. (R. 57.) However, Plaintiff does not use a cane or wear any braces, (R. 59-60), and, as set forth above, she is able to independently perform basic self-care and day-to-

day tasks.  Most notably, Plaintiff testified that she left her job with Nassau County due to a retirement incentive--not her medical condition--and when asked if she could go back and perform her job if it was available, she testified, "[p]hysically, yes." (R. 52.)  Accordingly, Plaintiff's ability to care for herself without assistance and her testimony that she could physically perform her prior job constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff testified to abilities that exceed Dr. Shapiro's stated limitations.

Plaintiff's attempt to minimize her testimony is unpersuasive.  Plaintiff argues that she made many qualifying statements that indicate "her ability to perform activities is dependent on the day."  (Pl.'s Br. at 16.)  However, the Court disagrees.  While, as previously noted, Plaintiff testified to having "good days and bad days," performing certain activities in "small quantities, multiple times," and struggling to walk down the grocery aisle, with the exception of obtaining rides from others when she is able to, Plaintiff's testimony indicates that she is able to perform self-care and day-to-day tasks without assistance from others.[10]  (See R. 52-57.)

---

[10] Given the Court's determination that substantial evidence supports the ALJ's failure to accord controlling weight to Dr. Shapiro's opinion, it need not address Plaintiff's arguments regarding her Medical Source Statement dated August 28, 2012. (See Pl.'s Br. at 18; see also R. 455-70.)

## 2. Drs. Fulco and Skeene

Plaintiff also argues that the ALJ erred in according "greater weight" to Dr. Fulco's opinion and "great weight" to Dr. Skeene's opinion. (Pl.'s Br. at 20.) Plaintiff avers that the opinions of consultative physicians should be given limited weight. (Pl.'s Br. at 20-21.) However, while a consulting physician's opinions should generally be afforded limited weight, "as part of [the] review of the evidence before him, an ALJ has the discretion to grant various degrees of weight to the opinion of such practitioners, which may be greater than the weight awarded to a claimant's treating physician." Heitz v. Comm'r of Social Security, 201 F. Supp. 3d 413, 422 (S.D.N.Y. 2016) (internal citation omitted). As set forth above, the ALJ's determination that Dr. Shapiro's opinion should be accorded little weight is supported by substantial evidence. The Court finds that the ALJ's determination that Dr. Fulco's opinion should be accorded "greater weight" and Dr. Skeene's opinion should be accorded "great weight" based on their consistency with the clinical diagnostic testing in the record and/or Plaintiff's testimony regarding her limitations, (R. 27-28), is similarly supported by substantial evidence.

## B. Credibility

An ALJ may reject a claimant's subjective complaints of pain as long as he follows the two-step process required by the applicable regulations. Guerrero v. Colvin, No. 15-CV-1211, 2016

WL 5468330, at *20 (S.D.N.Y. Sep. 29, 2016). First, the ALJ

"determine[s] whether the medical signs or laboratory findings

show that a claimant has a medically determinable impairment that

could reasonably be expected to the produce the claimant's

symptoms." Chicocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013).

If the ALJ determines that the claimant suffers from such an

impairment, the ALJ then evaluates "the extent to which the

claimant's symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence of record."

Williams, 2017 WL 3701480, at *11 (internal quotation marks and

citations omitted). To the extent the ALJ finds that the

claimant's testimony is inconsistent with the medical evidence set

forth in the record, he must weigh the claimant's credibility

pursuant to the following non-exhaustive factors:

> (1) plaintiff's daily activities; (2) the
> location, duration, frequency, and intensity
> of his pain or other symptoms; (3) factors
> that precipitate and aggravate the symptoms;
> (4) the type, dosage, effectiveness, and side
> effects of any medication the individual takes
> or has taken to alleviate pain or other
> symptoms; (5) treatment, other than
> medication, the individual receives or has
> received for relief of pain or other symptoms;
> (6) any measures, other than treatment, the
> individual uses or has used to relieve pain or
> other symptoms; and, (7) any other measures
> used to relieve pain or other symptoms.

Clarke v. Colvin, No. 15-CV-0354, 2017 WL 1215362, at *10 (S.D.N.Y.

Apr. 3, 2017). In formulating his final credibility determination,

the ALJ must set forth "specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." Chichoki, 534 F. App'x at 75 (internal quotation marks and citation omitted; alteration in original). However, when the ALJ's credibility determination is supported by specific reasons, it is entitled to deference on appeal. Guerrero, 2016 WL 5468330, at *20.

The ALJ determined that while Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms constrain the [ALJ] from accepting the claimant's allegations of total disability for the period under consideration . . . ." (R. 27.) Particularly, the ALJ found that the record contains "little evidence" that Plaintiff's daily activities have been substantially restricted by her impairments; "[t]he frequency and intensity of [Plaintiff's] symptoms does not appear to be highly significant"; the musculoskeletal evidence in the record is "fairly slight"; and Plaintiff's treatment is conservative, and there is no indication that she requires additional surgery or testing. (R. 28-29.)

Plaintiff argues that the ALJ's credibility findings are not supported by substantial evidence and alleges that her ability

to perform activities is not an appropriate basis for rejecting her testimony. (Pl.'s Br. at 21-22.) The Court disagrees. While the Second Circuit has repeatedly held that a plaintiff "need not be an invalid to be found disabled under the Social Security Act," Meadors v. Astrue, 370 F. App'x 179, 185, n.2 (2d Cir. 2010), Plaintiff's daily activities are a relevant factor to be considered. Cf. Martinez v. Commissioner of Social Security, No. 13-CV-0159, 2016 WL 6885181, at *15 (S.D.N.Y. Oct. 5, 2016), report and recommendation adopted, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016) ("[t]he ALJ did not err in considering [p]laintiff's relatively active lifestyle as part of his determination that she was capable of unskilled, light work").

        Moreover, Plaintiff's ability to perform daily activities was not the only reason cited by the ALJ in his credibility determination. The ALJ's conclusion that Plaintiff's symptoms are not of a highly significant frequency or intensity is supported by Plaintiff's testimony that she has two to three "bad days" per week where her pain is a six to seven out of ten along with "good days" where her pain is a four to five out of ten," (R. 57), as well as Dr. Shapiro's treatment notes reflecting that with the exception of one occasion when she reported nine out of ten pain when active, Plaintiff's active pain ranged from three to six out of ten and her resting pain ranged from two to five out of ten. (R. 394, 396, 398, 442, 444-45.) Further, at the hearing,

Plaintiff testified that she was physically capable of returning to her prior job with Nassau County. (R. 52.)

Additionally, the ALJ also appropriately noted the conservative nature of Plaintiff's treatment. At the time of the hearing, Plaintiff was taking Flexeril and Motrin for her back pain,[11] and she was not using a cane or any braces. (R. 57-60.) While Dr. Shapiro discussed injection therapy or surgery if conservative care failed and noted that Plaintiff would be a candidate for 2 level anterior lumbar fusion, there is no indication from Dr. Shapiro's notes that surgery or even injection therapy was recommended. (See generally R. 394-99, 442-46, 452.) Accordingly, the Court finds "no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling." Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010).

Finally, Plaintiff argues that her part-time work at an exercise studio is not an appropriate basis to reject her testimony, as her work history enhances her credibility. (Pl.'s Br. at 22.) First, there is no indication from the ALJ's decision that he relied on Plaintiff's part-time employment in assessing her credibility. (See generally R. 23-29.) The ALJ's sole

---

[11] Plaintiff was also taking Tamoxifen in connection with her breast cancer, (R. 58, 340-41), and Ambien to help her sleep, (R. 58).

reference to Plaintiff's part-time employment in his analysis at step three is his statement that Plaintiff worked part-time in a fitness studio as a receptionist, and that "[c]ounsel argues that the claimant could not have done more, but an attorney's argument in and of itself does not constitute evidence." (R. 27.) Second, while "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability," an ALJ may properly "discount a claimant's credibility in the face of a positive work history when that conclusion is supported by other substantial evidence in the record." Adamik v. Comm'r of Social Security, No. 12-CV-3593, 2013 WL 3984990, at *9 (S.D.N.Y. Jul. 31, 2013) (alteration in original; internal quotation marks and citations omitted). As set forth above, the ALJ's credibility determination is supported by substantial evidence and, thus, he properly disregarded Plaintiff's positive work history. Cf. Stanton, 370 F. App'x at 234 ("[n]o different conclusion is reached by the ALJ's failure to reference specifically [plaintiff's] good work history, because substantial evidence aside from work history supports the adverse credibility ruling").

C.  Vocational Expert Testimony

Plaintiff argues the vocational expert's testimony cannot support the ALJ's determination that she is able to perform other gainful work in the national economy because "the ALJ

premised his questioning on his [residual functional capacity] assessment which . . . lacks record support." (Pl.'s Br. at 24.) Plaintiff also notes that when asked to consider the limitations set forth in Dr. Shapiro's Medical Source Statement, the vocational expert testified that an individual with such limitations could not perform any work. (Pl.'s Br. at 24.) However, as set forth above, the Court finds that substantial evidence supports the ALJ's determination that Dr. Shapiro's opinion should be accorded little weight and Dr. Fulco's opinion, which provided the basis for the ALJ's residual functional capacity assessment, should be accorded greater weight. It follows that the ALJ's determination of Plaintiff's residual functional capacity and conclusion that Plaintiff could perform other work in the national economy based on Mr. Taitz's testimony regarding a hypothetical individual with the same residual functional capacity as Plaintiff is also supported by substantial evidence.

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

<u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion (Docket Entry 26) is GRANTED, Plaintiff's motion (Docket Entry 29) is DENIED.  The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September __30__, 2017
       Central Islip, New York